Each side will have ten minutes. Good morning, and may it please the Court. My name is Joseph Kelleher, and I represent the estate of Joseph Daher. It's a pleasure to be here with everyone. I would like to reserve two minutes for rebuttal. This case involves a foreign hedge fund and their domestic securities intermediary using life insurance products to wager on the life of a California senior citizen. The district court below found, in fact, that that particular wager was illegal. And on appeal, my friends do not dispute that holding. Instead, what they say is that this court and any other court has no power to hold them accountable. And they do that through what I call a Stoley two-step. On the one hand, Wells Fargo admits that they were paid the death benefit when the insured died, but they say that somehow they are not the payee under the statute that provides the right of recovery and that instead the only appropriate defendant is their principal, the hedge fund in Luxembourg, L.S.H. Okay, and then you turn to L.S.H., and they say, okay, well, you got us. We're the payee, but there's no personal jurisdiction over us because we're in Luxembourg. And when you put those two things together, what my friend's position is, is that even though their client's business model is to wager on the lives of hundreds, if not thousands, of American senior citizens, that there is not a single court in the United States of America that can hold them accountable when one of those wagers turns out to have been illegal. We think that is wrong. We think, quite frankly, it doesn't pass the smell test. This time that you get to hear from me, I'm here to talk about personal jurisdiction. Yeah, could you talk about what the actual harm is from a Stoley policy? It seems here that there's a bit of an odd situation where Delaware seems to think it's like a harm to the public, but California doesn't really think that, but you're saying the injury is in California. So could you talk about what the injury is that's in California? Absolutely. So you said a couple of things there, Judge, and let me unpack it. The harm of human life wagering has been well-established in the law. It goes all the way back to at least the 1800s. There are Supreme Court cases. We're talking about pre-eerie federal common law cases. Warnock, Grigsby, Oliver Wendell Holmes, for example, wrote one of those opinions. It's always been well-established that the insureds who are the subject of these wagers are harmed and that their families are harmed, and as this has become bigger and bigger— What is the explanation? How are they harmed? Well, they're harmed in many, many ways. First and foremost, there's somebody out there who wants them dead as soon as possible, and as Justice Oliver Wendell Holmes explained, that increases the likelihood and the risk that they will take action in furtherance of that. That's the Warnock case. That's the Grigsby case. It's cases all across the country. In addition to that, there is emotional, psychological, and moral harm to the individual who knows there are people out there wagering on his life and hoping that he or she will die quickly. There's the same harm to their family members because they know that there's a big investor out there that wants mom or dad dead as soon as possible. So there are many harms. Multiple states, including California— You said something that— California seems not to have treated this as illegal the same way that Delaware has. We disagree with that. And California is one of the many states that has put out publications that have explained all of the harms to the families. So there's no question that families and insurers are harmed. What my friends will say is that they believe that there are federal judicial opinions, not from the California State Supreme Court, but that there are opinions that came out in the 2000s that said that investors may have found a technical loophole. Fishman, for example, they cite. If you read that case, that judge was not happy about what he found the law to be. He said that he didn't think it was right, but he did think that there was this technical loophole. But there's no question that it harms families. Well, it seems to me, though, the threshold question for you to be able to argue that is you need to get into court in California. Absolutely, and I'd love to go right there, Judge. I want to turn your attention to personal jurisdiction. And we have— It's not working. We have— I'll talk loudly. We have the Walden v. Thiele case out of the Supreme Court, and that case counsels that we don't really look to the plaintiff's forum contacts, but we're looking in this case to, I guess, the Luxembourg or some other related entity. So would you address that? Absolutely, Judge. So in this case, consistent with Walden, this court, for example, Judge Friedland, the Shopify case, says when we're analyzing these questions about national, nationwide businesses and do they have sufficient contacts in a particular forum, we should look to, quote, the defendant's business model and, quote, the predictable consequences of that model. The defendant's business model is wagering on the lives of senior citizens. There's a specific way that it's done. We alleged it in our complaint. To recap, the first thing you do is you go find a senior on whose life you want to wage or you buy a policy. Then you have to hire people and direct them to do a variety of things. One of them is to maintain constant contact with that family so this guy doesn't disappear. So there's these e-mails. How's your father doing? How are things? Phone calls, e-mails. How's Mom? How's Dad? How are they doing? Are they okay? Are they in the hospital? Right? Oh, great. Great to hear. Or whatever, right? It's to maintain control over your investment because if he disappears, then you're in trouble, right? The other thing you have to do is to get the medical records updated constantly from the doctors, right? Because the longer this guy lives, the worse your investment. So if he becomes unhealthy, that's good for you. If he stays healthy, that's bad for you, okay? You also have to constantly calculate and recalculate the minimum premium that can be paid. You have to constantly evaluate whether you are underwater on this investment. Is it time to sell? Is it time to lapse? You also have to constantly monitor the obituary reports in the location in which the individual lives so that you can ascertain when he dies. Can I ask, you allege that all those things happen and those are the contacts with California. There was one more. Okay, so one more then. But is your argument that there is jurisdiction in this case because all of those things happened in California, but maybe in another case if someone invested in one of these policies but then was just not a good investor and never did those follow-up contacts, there would still be jurisdiction? Or does it depend on the follow-up contacts in California to keep the investment sound? I think it could potentially in another case depend on the facts of that case. But in this case, clearly we have it, and I'll tell you why. Because when LSH made the decision to buy this policy, it knew three or four things. It knew he lived in California. It knew all of his family lived in California. It knew all of his doctors were in California. Therefore, when it directed its either in-state, and there was a big in-state agent, or its out-of-state agents to do the various things, go talk to the family, get the medical records. Right, but does it depend on those various things? Like, does it depend on LSH actually following up and making sure that he's healthy or not healthy? Oh, no. Or just the owning of the policy itself? Well, it's not just the owning of any policy. It's when they made the knowing decision to buy this policy, they knew that all the stuff and all the people were in California, and therefore, they know their business, right? Coming back to Shopify, they know their business. They know that that is going to create a substantial and ongoing relationship with California, because they know... Say that this lawsuit happened, he died the day after they bought the policy. So they had never done these additional contacts. It was just the policy itself. Do you think that's enough, or do you think that there's jurisdiction in this case because there was years of follow-up in California? Well, certainly there's jurisdiction because there were years of follow-up in California. But to answer your question, I think there would be jurisdiction there, too, because they would have contemplated future consequences in California, which is one of the things we're meant to look at in the analysis. They would have contemplated, because they know their business. They know that all these things are going to happen there. I think a better hypo-judge might be if they bought a policy on a guy who had houses in a bunch of different states, his family spread out across the country, his doctors all around the country. In that case, then you might say to yourself, well, geez, did they really have reason to believe that their business would be happening in California? I don't know. That's not this case. In this case, all the people, all the doctors, all the things were there. And so there's been a lot of talk in this case about agency, and I actually think that the parties are talking past each other and that it's become a little pedantic. I think it's unquestionably true that if A directs B to go do some stuff in a state, that A's direction and the directed activities of B are attributable to A for personal jurisdiction. I think there's no question there. That's what happened here because they knew that all the stuff was in California. So when they said to their agent, go get his meds, go talk to the family, they were necessarily directing those agents to California. So where do you think the parties are talking past each other with respect to the third-party agency issue? I think they're citing cases that talk about or that contemplate situations where perhaps there's an entity that was alleged to be a general agent, and then there's a question of, well, did the particular thing they do, was there substantial control? We don't have to get to that in this case because there's no question they directed these entities to do a particular thing and that direction was necessarily towards California. I see that I'm running a little low. I wanted to touch on the fortuitous and random. I want to save some time for rebuttal. Why don't you save some time for rebuttal, and we'll hear from the other side unless you want to use it up here. Very good. Very good. Thank you. Good morning, Your Honors, and may it please the Court. Courtney Quiros from Alston and Bird on behalf of appellant Wells Fargo Bank, N.A., and here on behalf of LSH Co., the Cross-Eppley. The district court here correctly concluded that no personal jurisdiction lies in California as to LSH, and its decision should stand for three principal reasons. The first is LSH's conduct happened entirely outside of California, and the California contacts of the third parties that my friend on the other side mentioned cannot be imputed to LSH under this court's Williams opinion. Accordingly, the estate fails to allege any conduct on behalf of LSH expressly aimed at California. Second, LSH did not purposely avail itself of the privilege of doing business in California. The estate has not identified any contract creating the kind of substantial forum connection required under Burger King. Finally, the complaint does not plausibly allege that LSH could have foreseen harm to a California resident from purchasing a portfolio of policies on the secondary market. Can I bring you back to your first point? So Williams talked about the relationship between parents and subsidiaries and how maybe our old test had been overruled, but I'm not sure why that's relevant here where there's a company that's hiring other companies to do things in California for it. It doesn't happen to be a parent and a sub, so I don't know why the test for parents and subs is relevant at all. Why shouldn't we just look at what actions were directed by this company in California? Yes, Your Honor, and I think that if you take the position that Williams is really specifically talking about parents and subsidiaries, we can just focus on what LSH actually directed these third parties to do, which was to assist it with policy monitoring and other related activities, but none of those were specifically aimed at California. California only comes in because California happened to be where this insured resided. Had the day after the policy was purchased, the insured moved to Nevada, all the contacts would have been with Nevada. That is true, but in fact he lived in California, so they were sending people to California, calling California, writing to California. They were making contacts with California in furtherance of this business, so why doesn't that count as a contact with California? I think that we would maintain that there wasn't the kind of substantial control that you need pursuant to Williams in order to impute those contacts to LSH, but also the kind of contacts that we're talking about. My friend on the other side mentioned a few of them were electronic communications to the insured's relatives, a handful of those or some number of those, electronic requests for medical information, which were made by one of the third parties, and a letter sent to the forum state, the request for the receipt of the death certificate. But if I hear your argument correctly, there really never would be any personal jurisdiction vis-a-vis LSH in the United States, is that right? No, Your Honor, we haven't taken that position. No, but the practical impact, let's move our deceased person to Wyoming, Illinois, Massachusetts. You would be making the same argument, right? Not necessarily, and I think that we would look at the actions that LSH actually undertook. So here, that would be the purchase of the policy, which was negotiated by a contract that was in New York with a Delaware company. You would also look at the funding of the premium payments, which also happened outside of California. And then you would look at the receipt of the policy proceeds, which here happened in Minnesota. So I think we would look at those contacts. And which one of those would be sufficient? I think we would have to litigate and do discovery on those. You also said there was no personal jurisdiction in Delaware, right? That's why we're here. The court did find that there was no personal jurisdiction in Delaware. And my friend on the other side has also sued LSH on the same facts in both the District of Minnesota and the District of Utah. Those cases are stayed. Stayed for this one. Stayed for this one. But realistically, we kind of have the same situation there because we don't have even any of the things that you mentioned, the policy in New York with the Delaware company, the funding of payments, that sort of thing. So we'd be more or less, without getting into the details, the same situation in those states as you are here, which is basically no avenue for relief for the deceased, right? I think that on those facts, it's hard to speak about whether personal jurisdiction would lie in those states without getting into sort of their, also their agency imputation, whether any of those other contacts could be. So I guess the problem I'm having, I can't speak for my colleagues here, but the problem I'm having with your argument is that any foreign entity, if your test is right, any foreign entity will always hire some other company to do the contacts with the state instead of doing it itself because then it will not be liable anywhere. And that doesn't seem like it makes a lot of sense to me. So can you address the policy implication of your argument? Yes. And I think to return to the sort of fundamental principle that personal jurisdiction allows a company to know where it has sufficient minimum contacts in order to be called to account, if you look at that, that's just not satisfied here because these contacts are so minimal. So that's a different argument. So I think you have two arguments. One is you can't count the contacts made by the people we hired. The other is even if you count those contacts, there aren't enough. So you're jumping. When I'm asking you about the first argument, you're jumping to the second. Do you want to rest your whole argument on the second that we'll count these contacts by the people we hired? It's just they're not enough? Is that really your argument? No, Your Honor. I think that I disagree that Williams has this distinct difference between subs and parents and agents and, you know, third parties acting as agents and the party that they're acting at the behest of. And so I think that Williams is just skeptical that those kinds of, you know, without the substantial control, which you just don't have here, you know, they have independent contractors. So that gets back to the answer. So when I asked you why wouldn't a foreign company just hire other people to do all its dirty work, you jumped to, well, there wasn't enough action by the third parties. So let's put that aside. Let's go back to this question. Why would it make sense to read Williams that way? Because wouldn't that reading where Williams is just saying any other entity that's doing the dirty work, unless there's total control and they're basically the same company as the parent, I mean, why would that make sense as a test? Why should we think that that's what Williams meant? I think because the Supreme Court in Daimler was critical of the idea that there can be this sort of, and perhaps this is in Williams, this sort of the agency test that just asked, would the parent have done this if not for the relationship with the agent? It always stacks the deck against the party for purposes of personal jurisdiction, the parent party or the one directing the action. But Daimler specifically carved out, I mean, there's the footnote that says this could be different for specific jurisdiction. We're talking about general jurisdiction. So I'm not sure why we should read Daimler as really having addressed this issue. You know, Your Honor, I believe that Williams is just skeptical that agency theory could ever support specific personal jurisdiction. I mean, that may be true, but they may not. That's your position, literally. Yes. Right? It is. So I wanted to ask you if you would address the brisk and be shopified, because it's the probably most recent case out of our court with respect to not having these rigid dividing lines between purposeful direction and purposeful availment, kind of back to first year civil procedure. But how does that case affect your position? Yes, Your Honor, I'm happy to address that. I think, you know, Shopify notes in the Shopify decision, they note Shopify's extensive California contacts, including that Shopify knew about its California consumer base, conducts regular business in California, contacts California residents, interacts with them as an intermediary, installs software onto the devices, these kinds of routine contacts that are part of its business. And LSH's business is owning a portfolio of policies. And these contacts are not the sort of routine, you know, targeting California, you know, taking advantage of the California market, those sort of contacts that Shopify contemplates. I just want to go back to the more threshold question rather than comparing the facts to Shopify. But Shopify seems to confirm that we're not supposed to choose, essentially do what the district court did here, which was to say there has to be one test for the other, right, and that we're going to have to choose one test based on the nature of the claim. And we can read Shopify as saying, like, we don't do that anymore. Essentially, you just look at the full array. It could be purposeful availment. It could be purposeful direction. It could be some hybrid of the two that count. Can you address that threshold legal issue? Yes, Your Honor. I think that it is true that the court analyzed this under the purposeful direction, and it could have easily analyzed it under a purposeful availment, but that wouldn't change the outcome here. So you agree that the district court didn't have to just choose one or the other? No, and I think the district court, you know, typically viewing this as something that sounds more like tort than in contract, the district court focused its analysis on purposeful direction, which it was able to do. But if it had analyzed this under purposeful availment, it would have found that there wasn't a substantial connection between the defendant and the forum state as opposed to the plaintiff and the forum. Okay. I see that I'm out of time. Thank you. Let's put two minutes on the clock for rebuttal, please. Thank you, Judge. Briefly, my friend talks and tries to minimize the context, one of the two things Your Honor mentioned, but Shopify instructs us to look at the nature of the defendant's business model. And the context that I described for you that were either in California or directed to California, that's the whole show. For the human life wagering business, that's it. That's what you do. And here they either did it in California through Preston Ventures, who was their investment advisor, or they necessarily directed their agents into and towards California. Speaking about Shopify, it also rejects the agnosticism theory, this idea that a nationwide business can say they didn't expressly direct towards a state because they didn't care. That's effectively what my friends are saying. They're basically saying we didn't care. We knew we lived in California and all its people and stuff were there, but we didn't really care. Joe, we would have wagered on Mr. Daher's life if he lived on the moon. It's essentially what they're saying. But that was rejected in Shopify. That agnosticism in the court brought us back to the test, which is, are the contacts its own choice? And here they undeniably were. Nobody held a gun to the head of this big hedge fund. They didn't have to buy a policy on a Californian with California family and California doctors. They chose to. They talk in their briefs about bulk purchases. They bought nine policies. The portfolio here was nine policies. Look in the record. It's on page 240 of the excerpts. Does that matter to your argument, or are we only focused on the contacts related to Daher? It rebuts their argument that they couldn't possibly know, right? Or they couldn't possibly check that, that it wasn't their choice. And if you look at 240, you'll see that they were offered 15 policies, and they declined to buy five or six of them. Why? I have no idea. But the point is, if you didn't want to be hailed into California to assess – You're basing it on offering being one of the contacts, right? What I'm saying is they made a voluntary choice, right? Their own choice. They didn't have to buy Daher. If they didn't want to be called to account in California, then don't buy a wagering policy on the life of a Californian. And if you do, don't cry foul if later you were called into court in California to account for that. That's what I'm saying. I see I'm out of time. I'm happy to answer any further questions or be done. So, yeah, thank you both sides for the helpful arguments in this case. This case is submitted. Our next case on calendar is related. They're not going in here? Our next case on calendar is Daher v. Wells Fargo, 24-5231, and each side will have 10 minutes in this case as well. Hi again. Hello again, Your Honors. I represent Appellant Wells Fargo Bank, N.A., and with this court's permission, I'd like to reserve two minutes for rebuttal. This appeal really centers on the interpretation of two Delaware statutes. The first statute is 10 Del C., Section 8106, which establishes a three-year statute of limitations for actions based on a statute. The Delaware Supreme Court's definitive interpretation of Section 8106 comes from a 1966 divorce case, Butler v. Butler, which is not a model of clarity by today's judicial standards. But that said, the estate's claim against Wells Fargo is indisputably based on a statute, and the Delaware Supreme Court in Butler held that those words apply to actions as here that seek to recover money or property based on a statutory claim. The district court reached a different conclusion based on unreason dicta at the end of Butler. So the Delaware Supreme Court is going to decide this issue, right? Is there any reason for us to decide it, or should we just wait for them? That is correct, Your Honor, that the Delaware Supreme Court is going to decide this issue in the Estata Frank case, which is fully briefed as of September 12, 2025. And then the issue there is what is the statute of limitations under this particular Delaware statute, right? That's correct. And that's the same issue we have here. That's correct, Your Honors. Is there any guess of how long it'll take them to decide that question? No, the Delaware Supreme Court is actually usually pretty quick, so we understand that it should be either at the end of this year or the beginning of next year that they'll hear oral argument, and they typically render decisions within a year. So this was certified in March, fully briefed in September, so we should have that decision fairly soon. If Your Honors are satisfied on Section 8106, I'll turn to the second statute, Section 18-C, Section 2704-B. Section 2704-B permits an estate to bring a claim to recover policy proceeds for a stoley policy that are paid to someone other than the decedent's estate. For the purposes of this appeal, the question is simply, who does Section 2704-B allow an estate to bring a claim against? Section 2704-B says that an estate may maintain an action to recover such benefits from the person so receiving them. So in this case, the estate brought a claim against Wells Fargo to recover the $5 million policy proceeds, even though it's undisputed that Wells Fargo is not the party who so received the benefits. A different entity received and holds the proceeds from the life insurance policy in this case. Ignoring the full text of Section 2704-B, the district court granted summary judgment for the estate because it found a Section 2704-B claim can be brought against any payee of a policy, even if it was not the entity that ultimately received the policy proceeds. Because the district court got these statutory interpretation questions wrong, including the one that will be considered by the Delaware Supreme Court- So the statute actually does say beneficiary, assignee, or other payee. And then Malkin, the Delaware Supreme Court, seemed to be saying that even though a securities intermediary is unlikely to face ultimate liability under Section 2704-B, it will generally find protection from sources such as general principles of agency law or its contract with its customer, the beneficial owner of the policy. So it seemed to me the court was saying the payee or the securities intermediary can be covered and does have to go get- even if they're not the true beneficiary, it's up to them to go deal with that with their claim. So I'll take that first and then go back to the plain language of the statute. Malkin was considering whether the Section 8502 and 8115 of the UCC applied, so it was two certified questions to the Delaware Supreme Court. It was not considering whether 2704-B considered securities intermediaries like Wells Fargo to be a payee under the policy. In fact, in that case, if you look at the first certified question, the Delaware Supreme Court in its question acknowledges that both Wells Fargo and Berkshire in that case were holders of the policy proceeds. So it was assuming for purposes of the two certified questions that it was considering that they were holders of the policy proceeds. So Malkin didn't reach the question. But on that language that you've pointed to, Your Honor, I would just point to the Malkin Southern District of Florida's opinion, which says that a securities intermediary would appear to have no liability if it merely passed on the policy proceeds in full. It could be liable as a payee if it retained the proceeds for itself, which it's undisputed that in this case, Wells Fargo did not retain the proceeds for itself but passed it on to the beneficial owner of the policy. Going back to the – so I agree that the certified questions didn't cover this question. So I actually kind of agree with you that they didn't flat out decide this issue. But wouldn't it have been a weird opinion if they weren't assuming it? It feels like they were assuming it must be true that they were a payee. I think for purposes it was assuming that Wells Fargo was a payee. But the question of in what circumstance Wells Fargo is a payee wasn't before the court. So actually if you look at the 11th Circuit on remand, if you look at that opinion, there was underlying sort of briefing and then an admission that they would be jointly and severally liable, Wells Fargo and Berkshire. And that's not the case here where it is undisputed on the record that Wells Fargo did not keep the policy proceeds. We're not bound by what the 11th Circuit or the Florida court said, though. So why is that correct? Why is the definition of payee not including someone who got the money and passed it along? I would direct Your Honor back to the language of Section 2704B, which speaks of maintaining an action to recover the benefits from a person so receiving them. And at the time that Section 2704B was enacted, it was prior to this secondary market for life insurance policies and securitization, as we know now, which the Malkin court explains in its decision. And so there it's very clear that Section 2704B wasn't meant to tag securities intermediaries. That wasn't the intent. So we look at that phrase, the person so receiving them, and it's talking about the person that holds the policy proceeds. And here, that entity is known, and it's not Wells Fargo. So the lower court in this case— Well, sorry, what do you mean by holding the proceeds? There's like a moment in time where Wells Fargo did hold the proceeds, right? Only in its capacity as a securities intermediary. But why does that—you know, if you give me $1,000, am I a person receiving the money? I'm focusing on the verb receiving. I think if you're— And then I give it to Judge Friedland about two seconds later. I think that under the statute, if you were acting in your role as a securities intermediary, which means that you're entirely contemplated to pass that on to Judge Friedland. So your contract says that you never beneficially hold that $1,000. That $1,000 is always earmarked for the beneficial owner in your role. And then you combine receipt with the beneficiary. I mean, you sort of merge these terms. And I think that goes back to sort of what the General Assembly expected at the time of the enactment of the statute. And Malkin says that, you know, Section 2704B, it doesn't contemplate this scenario because it was talking about, you know, at the time, the, you know, procurers of the policy and the family and those entities, but not specifically these securities intermediaries, which is a relationship that sort of developed as this secondary market for life insurance has developed. But I think to—I see that I'm at my two minutes, and I want to reserve time for rebuttal. Thank you. Let's hear from the other side. Hello again. I'd like to begin by discussing the Frank case and the implications, if any, here. Let me be clear. The issue, the statute of limitations issue before this court is much narrower than the certified questions in front of the Frank court and the Delaware Supreme Court. The only question in front of this court is whether the estate's 2704B claim constitutes an action based on a statute within the meaning of Section 8106. There are many other independent arguments that are being made in the Frank case. For example, they say, well, maybe it's a one-year statute. They say, for example, well, maybe one of the other seven clauses of 8106 provides jurisdiction. None of those arguments were made here. They weren't made below. They're not being made here. So we don't know, ultimately, when Frank gets decided. It could be on one of those alternative bases, which would have been, which is not in this case. This case is a question of whether the district… Why shouldn't we just wait rather than launch out on a Delaware statute? That's a good question. And the answer to that question is that there are multiple alternative bases to sustain and affirm the district court. Right? This court is sitting as a court of errors. The question is, did the lower court err? And that it applies and find some other reason? We could assume, theoretically, for sake of argument, that there is a three-year statute of limitations, and you could find that the estate's claim is nonetheless timely for a variety of other reasons, one of which is the savings statute, the other of which is equitable tolling. On the savings statute, we have to talk about the facts, right? We filed a Delaware action against Wells Fargo and LSH within two years of the death, two years of the payment. So unquestionably within any three-year period. The trouble there is you voluntarily dismissed against Wells Fargo, correct? We did that. I don't think it's trouble, and let me explain why. Their lawyers came to us and said, Joe, you've got LSH in the case. They got the money. Why don't you just go against them? And as a courtesy to them, we said, okay, we'll dismiss you. We're reserving our rights without prejudice. We'll proceed against them. This was five years ago. This was long before we knew about the Stolley 2 step. Okay? And then what happens? Oh, surprise, surprise. LSH says, tricked you. No jurisdiction over us. And we're like, oh, okay. So now we have to litigate this motion to dismiss. Took the court about a year to decide. Within one month, we filed here in California. So I don't think that our voluntary dismissal of those claims is a problem for us under the savings statute because the savings statute talks about actions, the end of an action. And the action here wasn't done until the case was dismissed. And then within one month of that, we had a year. The Delaware Supreme Court has been clear about the purpose for the savings statute. The purpose is to avoid piecemeal litigation. What I think they are effectively saying is, Joe, once we asked you to and you were nice enough to dismiss us or at least as soon as LSH turned around and tricked you, then you should have sued against us in California because we would unquestionably have been within the three-year period. But what would that have been? That would have been the very piecemeal litigation that the Delaware Supreme Court says the savings statute is designed to prevent. I understand how this happened, and it's sort of sympathetic, but it really feels like it's two different cases. Like your claim against Wells Fargo is pretty different than the claim against LSH. And part of your idea, I think, is that you could recover from both of them, I think. Isn't that your theory? Respectfully, the claim is identical, and yes, jointly and severally against both. And when they said to us, Joe, can you get us out of the case so that we don't have to spend twice the money on lawyers in the same arguments and just go against LSH, we did, I think, what most courts want lawyers to do. Maybe I misunderstood this, but are you trying to recover? I actually thought you were trying to recover the full amount twice. Is that not true? Incorrect. One time. We get it once. We don't get it twice. Would you be satisfied if you got it from either defendant? Absolutely. But now they're saying, Joe. You get it no times. What's your best Delaware case on equitable tolling? Equitable tolling is a separate basis. The Delaware courts have been clear. Equitable tolling applies in three situations, or at least three situations. In order to get equitable tolling, you have to show that you fall into one of those three situations. The easiest situation for me to explain to you right here as a court of appeals is the one that says, did the plaintiff timely assert rights in the wrong forum? We unquestionably asserted those rights against them within the alleged three-year period. The Owens case, they cited. It explains the elements that must be proven. There are two of them. Number one, was the plaintiff neglectful in pursuing its rights? And number two, did the defendant have notice within the statutory period? Clearly, they admit they had notice within the alleged three-year period. So the question is, were we neglectful? And the answer is no. We were diligent. I just explained exactly what we did. And there was no prejudice to them because they knew about this case within the thing. So we think that there are these alternative bases to find that the case was, there's no timeliness problem, if that makes sense. Now, I do want to address some of the other items. So if there's no questions, I'll move on to what I call their securities intermediary defense, which is this idea that even though they got paid the money and even though they were the beneficiary and even though they admit they took an assignment and even though they admit they received the money, that somehow they're not a payee or an assignee or a beneficiary. The Malkin case was raised. That was my case. I wrote the briefs along with my colleague, Greg Starr. Greg and I went down to Delaware and argued that case. I know it very well. The substance of the arguments that are being made here were just a bailey. We never really held the money. We never had dominion, control, et cetera. Exactly the same substantive arguments that were made in the Delaware case. And the Delaware Supreme Court rejected it. And the reasoning was not some hyper-technical UCC 8-115 reasoning. The reasoning was they said it wasn't an adverse claim because we will not ascribe to the legislature the intention of allowing human life wagers to come to fruition and to pay out. And if we interpreted adverse claim, Wells Fargo, the way you want us to, we would in effect be doing that. And we won't ascribe that intention to the legislature. But that was for purposes of this UCC question. It wasn't – I mean, they weren't asking – this question wasn't before them, the one you're trying to get us to decide now. I think if you look at it as a hyper-technical matter, it was not. The payee question was not before them. It was instead the question of whether they were entitled to the securities and intermediary protections of 8-115 and the UCC. But if we look past the form to the substance, the substantive arguments they made are identical. And the Delaware Supreme Court's reasoning, which is on page 65 and again on 69 of the opinion, is broad enough to control the question in this case about whether they're a payee. You're saying that if we look to that, we could predict how the Supreme Court would – Delaware Supreme Court would decide this issue. Yes, ma'am, which of course a court in diversity is what it's meant to do. I don't have to tell this court that. My friend mentioned that they didn't – we didn't – on this, did we argue payee? I went back and reread the briefs because this was like deja vu to me. We said in our briefs that they don't contest that they are the payee. Wells Fargo, was them in the case. They had a responsive brief. They didn't come back and say, oh, no, Joe, you got that wrong. We're not the payee. They accepted that they were the payee because they got paid the money. And they're trying to drive some weird nonexistent factual wedge, I think, between this case and Malkin by saying that they did something different with the money. They did the exact same thing, Judge Friedland. I think you were on to this with the money. They got the money. Wells Fargo got the money from the insurance company, and then shortly thereafter, they credited it to their client's account at the bank, at Wells Fargo's bank. What I'm trying to say is who filed the claim with the insurance company? It was Wells Fargo? Yes. The securities intermediaries stand as the owner and beneficiary of the policies on the books and records of the insurance company. So the claim is made. So Wells Fargo takes the action with the insurance company and makes the claim. Is the literal payee technically on them? Yes. Yes. So the check is written to Wells Fargo, for example, right? The owner and beneficiary of the policy, as far as the insurance company knows, is Wells Fargo. They pay it to Wells Fargo. Wells Fargo takes the check, negotiates it, and then shortly thereafter, credits it to the account of their customer. Wells Fargo isn't saying to the insurance company, like, I'm claiming this on behalf of LSH. Wells Fargo is the owner as securities intermediary on the books and records. They often do not. They almost never disclose the underlying identity of the investor. What if the way this worked was that the insurance company wrote a check for the amount, like, to cash, and they hand it to a delivery person who has the job of taking this check for cash to LSH? Would the person with the check for cash be a payee? I'm trying to understand. Like they have in their hand something that could be cashed for the money. They don't actually cash it. They bring it to LSH, but it was in their hand, and it was money, basically. Or what if they hand them cash? Let's make it easier. Let's make it easier. They hand them a suitcase of cash. Let's make it easier. It doesn't matter. They hand them a suitcase of cash. It doesn't matter. And they carry it to LSH. Are they a payee? Absolutely. They are. They received the money. They got paid the money. They got the money. They're a payee. Well, you're distinguishing, I guess, between, like, a UPS delivery driver versus someone saying, I'm the one who is entitled to the payment.  Yeah. Wells Fargo was the beneficiary of the, I mean. I'm sorry. Would you distinguish, literally, the messenger hired to bring the cash from point A to point B? The mailman? No. I don't think the mailman's a payee. But the owner and beneficiary of the policy to whom the check was made and that it was paid? Absolutely. Absolutely they are. And the Delaware Supreme Court was clear about this, right? Because in that case, there was Wells Fargo and the investor. And they were both held jointly and severally liable once it got remanded. And the whole point of the opinion was, look, guys. The investors are going to be the ones who ultimately pay. They're indemnified. It's the same lawyers. There's no dispute about that in this case. If Wells Fargo is ordered to pay. Back to my confusion on this. So you are actually suing to not recover the money twice. You're saying you want them to be jointly and severally liable. But on your reading of the statute, is that required? Or could you get the money from everyone along the chain? Like twice and three and four times? Wouldn't that be nice? No, Judge. I mean, that's unreasonable. What is stopping you? I thought your theory. The premiums paid to third parties. There's a claim for the offsets, right? That I think you're saying they should not. Right. I didn't hear anything about that. So I didn't respond. I'm happy to respond to that. Well, that seems like a different question. So my question is, you may happen to not be asking for the same money twice. But what part of your theory prevents you from asking for the same money twice? Because the statute says that the executor of the estate is entitled to recover any benefits that were paid by the insurance company. It doesn't say you get to get paid double benefits or triple benefits. You get the death benefit. The death benefit is one death benefit. Whoever it was paid to is who you can sue. On your theory, it was paid to many people along the way, and all of them are liable. So why couldn't you just get it from all of them? I think this brings us back to some general principles of agency. Imagine an agent goes out into the world and does some wrongful act with respect to a third party. What does the third party do? Well, they sue the agent. The agent, if held liable, pays the third party. And they turn around to their principal and say, hey, I was acting within the scope of my agency with you. You need to make me whole. That's how it happens. That person, that third party, he can sue them both, but he can't recover twice. So we can't recover twice. We can recover the death benefit. I was just going to say, doesn't it really hinge on the initial that you get the death benefit that's payable under the policy? Yes, ma'am. Yes, Judge. Absolutely. Absolutely. I can respond to your question about the premiums, and I can do it very briefly if you'd like. I'm seeing a yes and a no. I think we're fine. I just wanted to make sure there wasn't a confusion between the no offset arguments and the double payment arguments, but it seems like there's no confusion about that. I'm not confused. So let's put two minutes on that. I think it was two minutes, but maybe slightly more on the clock for rebuttal. Okay, great. Thank you, Your Honors. I first want to start by briefly addressing what my friend on the other side said about the facts regarding the voluntary dismissal and just make a note that those facts are not on the record the circumstances of the voluntary dismissal. On the savings statute, I would just direct this court to the court's decision in Murphy v. Allen Family Foods, which says that there's no exception for voluntary dismissal, exception to the statute. I also want to briefly touch on the fact that Malkin says that 2704B must be read consistently with the common law, and the common law treated securities intermediaries in the way that we're articulating here, more in the context of, you know, brokers acting on behalf of their clients and passing along, you know, intermediaries passing along sports bets winnings and banks acting for a depositor. And my friend's argument sort of would subvert the common law understanding of how securities intermediaries are considered under Delaware, established Delaware law. I would also like to just briefly talk on the premium offset point, if I may. We have argued there also that the common law case of Warnock stands for the proposition that limited the recovery of the death benefit to the death benefit minus the premiums paid by others. Wells Fargo didn't pay any of those premiums, correct? No, Wells Fargo did not pay the premiums. The premiums were funded by the beneficial owners. And can you also just quickly address the question of when the claim accrues? I think there's an argument that it only accrues when the representative for the estate was appointed. Yes, Your Honor. And I think that that question of accrual, their argument about the benefit check was issued on February 22, 2018, and the claim accrues at the time of that wrongful act. And the estate urges that it wasn't until the administrator was appointed here. But that's not consistent with Green v. Loper, where the court found that the word accrue does not presuppose the existence of parties or persons capable of suing and being sued. Right, but I assume Green wasn't dealing with a statute that expressly said that the claim can be brought only by an individual's executor or administrator. So I guess I just don't know if that's something that the legislature could override. I'm sorry, Your Honor, I think I misunderstood your question. I mean, why couldn't the legislature, isn't it, could be signaling that they only want this particular statutory claim to accrue when it comes in? I mean, there's an argument, I think at least, because of the wording of the statute, that they can only be brought by the executor or the administrator, that the claim doesn't even arise until there is one. So you're just saying, I mean, Green was in 1949. Right. I think looking at the language of 2704B, or 2704A, we're talking about the individual insured or the individual's executor or administrator. So it's not clear that it was meant to only accrue at the time of the appointment of the executor or administrator. Which is what would happen, I mean, if only the executor and the administrator can bring one, I mean, sometimes it can take a very long time for the executor or administrator to be determined. So it just seems like there would be this strange thing where there's this statutory claim, but no one could bring it. I would point, Your Honor, to some of the cases... And the time is running. Thank you, Your Honor. I would point, Your Honor, to some of the cases that we cited in our briefing related to other statutes that contemplate the appointment of an executor or administrator that have similarly short time periods. As another example, that even though there was this statutory period to bring this claim, it wasn't unreasonable given that it may take some months to have an administrator or executor appointed. And so I don't think that it's obvious from the face of Section 2704B that there was, you know, there was some conflict because of the time that it would take to appoint an executor or administrator in this case. Thank you, Your Honors. Thank you, both sides, for the helpful arguments. This case is submitted.
judges: McKEOWN, FRIEDLAND, SUNG